IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHILIP BECK, Individually and
On Behalf of All Others
Similarly Situated and
Derivatively on Behalf of
EQUITY OFFICE PROPERTIES
TRUST,

              Plaintiff,

      v.

THOMAS E. DOBROWSKI, SAMUEL
ZELL, WILLIAM M. GOODYEAR,
JAMES D. HARPER, JR., SHELI Z.
ROZENBERG, JAN H.W.R. VAN DER
VLIST, RICHARD D. KINCAID,
MARILYN A. ALEXANDER, STEPHEN
I. SADOVE and SALLY SUSMAN,

           Defendants,

    -and-

EQUITY OFFICE PROPERTIES
TRUST, a Maryland Real Estate
Investment Trust,

      Nominal Defendant.

Case No. 06 C 6411

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Philip Beck (hereinafter, the "Plaintiff") brings this shareholder action against nominal defendant Equity Office Properties Trust ("EOPT") and its board of directors, Defendants Thomas Dobrowski, Samuel Zell, William M. Goodyear, James D. Harper, Jr., Sheli Z. Rozenberg, Jan H.W.R. Van Der Vlist, Richard

D. Kincaid, Marilyn A. Alexander, Stephen I. Sadove, and Sally Susman (hereinafter, "the Board") under Sections 14(a) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a) (the "SEA"), and related common law causes of action. Defendants have moved to dismiss Plaintiff's Second Amended Complaint ("the Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendants' Motion is **granted**.

## I.  <u>BACKGROUND</u>

The Court derives the following factual and procedural summary from the pleadings, resolving all reasonable inferences and factual conflicts in Plaintiff's favor.

This case arises from the February 7, 2007, sale of EOPT, formerly the largest publicly held office building owner and manager in the United States. The Blackstone Group ("Blackstone") acquired EOPT for $39 billion cash, or $55.50 per share, following a vote of EOPT shareholders approving the transaction.

The sale marked Blackstone's victory in a bidding war for EOPT between Blackstone and Vornado Realty Trust ("Vornado"). Although at least two other companies had previously expressed interest in acquiring EOPT, EOPT only began meaningful consideration of a sale in July 2006 when Vornado approached EOPT, and the companies entered into a standstill agreement to engage in high-level discussions. Ultimately, on October 25, 2006, Vornado met with Defendant Zell regarding a deal, but discussions apparently broke

down, and Vornado and EOPT had no further direct contact following this meeting.

Approximately one month after Vornado and EOPT began discussions, Blackstone approached EOPT regarding its own interest in purchasing EOPT for between $40 and $42 per share. Eventually, on November 2, 2006, Blackstone increased this figure to $47.50 per share. After another two weeks, on November 19, EOPT and Blackstone signed a merger agreement at $48.50 per share, for a total of $36 billion, in cash with an early February closing date.

The November 19 agreement did not, however, end the sale process. On January 17, 2007, Vornado made an unsolicited proposal to buy EOPT at $52 per share, payable 60% in cash and 40% in Vornado stock, subject to approval by Vornado shareholders. In response, on January 24, Blackstone proposed to increase the consideration for the November 19 agreement to $54 per share, contingent upon an increase in that agreement's termination fee from $200 million to $500 million. Then, on February 1, Vornado revised its proposal to $56 per share, payable $31 per share in cash and the rest in Vornado stock. On February 4, Vornado further modified its proposal to involve a tender offer for up to 55% of EOPT's shares at $56 with the rest to be acquired through a swap for Vornado shares. On February 5, EOPT sought and received from Blackstone two increases in the consideration for an all-cash Blackstone-EOPT agreement, first to $55.25 per share, then to

$55.50 per share, contingent upon a further increase of the termination fee, this time to $720 million. On February 7, Vornado withdrew its proposal, and EOPT shareholders voted to approve the EOPT-Blackstone merger agreement at $55.50.

During the bidding war, the EOPT Board filed with the SEC and disseminated to shareholders four proxy solicitations. The first was on December 29, 2006 ("the Initial Proxy"), and related to the initial November 19, 2006, merger agreement with Blackstone. It described the history of other companies' interest in acquiring EOPT and the Board's and EOPT management's discussions with such companies. It stated the initial terms of the proposed Blackstone merger, as well as the Board's recommendation that the shareholders vote to approve the merger. Additionally, it disclosed the ownership by three of the ten EOPT Board members of certain classes of stock granting those members the option of converting their shares into an ownership interest in the surviving partnership. The Initial Proxy also disclosed the fact that eight shareholder suits (including this one) had been filed against the company and the Board, alleging breaches of fiduciary duties, failure to maximize shareholder value, and improper self-dealing by the Board. The Initial Proxy provided for a vote date of February 5, 2007.

Following the Initial Proxy, the Board filed and disseminated three supplemental proxies: the "First Supplemental Proxy" on January 29 in connection with Blackstone's January 24 increase in

its offered consideration; the "Second Supplemental Proxy" on February 2 in connection with Vornado's February 1 revised offer; and the "Third Supplemental Proxy" on February 6 in connection with Blackstone's ultimate increase in its offered consideration to $55.50. Each supplemental proxy reported EOPT's most recent discussions with Vornado and Blackstone, described the proposed terms of Vornado's expressions of interest, stated the terms of the amendments to the Blackstone agreement, indicated the Board's and management's concerns about the structure of the proposed Vornado deal and the likelihood of it closing, and recommended that shareholders vote in favor of the amended Blackstone merger agreement. The Second Supplemental Proxy also informed the shareholders that the vote date would be delayed until February 7, 2007.

The instant suit is one of three currently pending shareholder actions arising from EOPT's sale. The other two suits are in the Maryland and Illinois state courts. The Maryland action names EOPT and the members of EOPT's Board as defendants and advances claims related to breach-of-fiduciary-duty, negligent misrepresentation, and fraud. That suit initially unsuccessfully sought to enjoin the Blackstone merger. Subsequently, the Maryland court dismissed most of that complaint's claims with leave to replead only certain allegations, which the Maryland plaintiffs did. The Maryland court

eventually dismissed the amended complaint in its entirety, and the Maryland plaintiffs have appealed.

This case and the Illinois state case have lagged behind the Maryland action. Plaintiff here originally filed his complaint shortly after the November 19, 2006, merger agreement was announced but then filed the Second Amended Complaint (the subject of this motion) following the Maryland court's initial dismissal of the Maryland action with partial leave to replead. As for the Illinois action, the Illinois court has stayed that case pending the resolution of the Maryland case.

## II. <u>DISCUSSION</u>

The Complaint comprises six counts. Counts I and II allege individual and derivative claims under Sections 14(a) and 20(a) of the Securities Exchange Act, respectively. Counts III through V allege various individual and derivative claims under Maryland state law. Count VI alleges a class claim of breach of fiduciary duty under Maryland state law. Plaintiff's claims attack the sufficiency and truthfulness of Defendants' proxy disclosures, the adequacy of the sale price, and the general process by which Defendants sold EOPT.

Defendants move to dismiss all counts in their entirety. Plaintiff does not oppose dismissal of all derivative claims and of Counts III through V in their entirety. Consequently, only three counts remain pending – Counts I, II, and VI.

## A.  Securities Exchange Act Claims (Counts I & II)

Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, together prohibit the solicitation of any proxy

> containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

Section 20 of the SEA, for its part, imposes liability on persons having control over, or aiding and abetting, violators of the SEA.  *See* 78 U.S.C. § 78t.  This secondary liability depends on a finding of primary liability under the relevant provisions of the SEA, in this case Section 14(a).  *See FMC Corp. v. Boesky*, 727 F.Supp. 1182, 11199 n.19 (N.D. Ill. 1989).

Plaintiff alleges that EOPT's proxy statements regarding the Blackstone deal violated Section 14(a) and Rule 14a-9 in two general ways.  Plaintiff alleges that the Initial and Supplemental Proxies made untrue statements of material fact and omitted to state material facts related to the sales process and the value of the company.  Plaintiff also alleges that the Initial Proxy was made materially false or misleading because the Board disseminated

the Supplemental Proxies too late for shareholders to absorb adequately and reasonably consider the supplemental information.

## 1. Applicability of the Private Securities Litigation Reform Act

As a threshold matter, the parties disagree on the applicability to this action of the Private Securities Litigation Reform Act ("the PLSRA" or "the Act"), 15 U.S.C. § 78u-4. Two aspects of the Act are potentially relevant. First, the Act provides for a heightened pleading standard in securities cases involving allegations of false or misleading statements or omissions of material fact. The Act requires the plaintiff to "specify each statement alleged to have been misleading[] [and] the reason or reasons why the statement is misleading. . . ." 15 U.S.C. § 78u-4(b)(1). The Act further provides that when "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Second, the Act sets forth the following "loss causation" proof requirement: "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

Plaintiff argues that the PSLRA does not apply to Section 14(a) claims. As for the heightened pleading requirements, Plaintiff contends that because Section 14(a) claims can be based on mere negligence, he need only meet the familiar "short and plain statement" notice pleading standard set forth in Federal Rule of Civil Procedure 8(a). As for "loss causation," Plaintiff contends that 14(a) claims are governed by the relaxed causation analysis set forth in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970), rather than by the PSLRA.

The Court concludes that the PSLRA governs Plaintiff's claim. Although the Seventh Circuit has not decided whether the PSLRA applies to Section 14(a) cases, the statutory language is unambiguous. All relevant sections of the Act commence with the phrase, "***[i]n any private action arising under this chapter***," 15 U.S.C. § 78u-4(b)(1), (2), & (4) (emphasis added). The Act contains no exceptions based on considerations of scienter or previous common law causation rules. Indeed, the Act's pleading standard provisions are to the contrary. Section (b)(2) applies to actions for money damages requiring proof of only "a particular state of mind." Since negligence is a state of mind, the language of Section (b)(2) by its terms encompasses negligence-based securities actions. What is more, the omission of the "particular state of mind" language from Section (b)(1) implies that

Section (b)(1)'s heightened standards apply even to securities actions requiring *no* proof of mental state.

Plaintiff's view that the PSLRA does not apply to his complaint is based on the case of *Blau v. Harrison*, 2006 WL 850959 (N.D.Ill., 2006). *Blau* held that the PSLRA's pleading standards are inapplicable where the plaintiff's 14(a) claim sounds in negligence rather than intentional fraud. *Id.* at *6.

In the Court's view, *Blau* is unavailing to Plaintiff. *Blau* rests on the Seventh Circuit's opinion in *Kennedy v. Venrock Associates*, 348 F. 3d 584, 593 (7th Cir. 2003), which states only that Federal Rule of Civil Procedure 9(b)'s heightened pleading standards do not apply to Section 14(a) claims unless those claims charge fraud, as opposed to negligence. But *Kennedy* never addressed the PSLRA at all, and since Rule 9(b) is expressly limited to claims of fraud or mistake, *Kennedy*'s analysis regarding the interplay of that rule and Section 14(a) does not translate to the PSLRA, which contains no such limitations. *Blau* is also unavailing to Plaintiff because that case did not address the "loss causation" question at all.

In applying the PSLRA to this Section 14(a) action, the Court joins the majority of courts that have addressed the question. *See, e.g.*, *Knollenberg v. Harmonic, Inc.*, No. 03-16238, 152 Fed. Appx. 674, 682-683 (9th Cir. 2005); *Hayes v. Crown Cent. Petroleum*

*Corp.*, No. 02-2190, 78 Fed. Appx. 857, 861 (4th Cir. 2003); *Fisher v. Kanas*, 467 F.Supp.2d 275, 281 (E.D.N.Y. 2006).

In any case, even if this Court agreed with *Blau*'s view of the PSLRA's heightened pleading standards, Plaintiff's reliance on that case is misplaced because, unlike in *Blau*, Plaintiff's 14(a) claims here are based in intentional conduct, not negligence. Although Plaintiff attempts to cast his claim as negligence-based, the language of the Complaint betrays his efforts. To give just a few examples, Plaintiff alleges: (1) Defendants rushed the sale of EOPT "***in order to avoid an informed shareholder vote*** and ***evade liability*** for their misconduct here" (SAC ¶ 5.); (2) "it is safe to assume that the information contained in the Second and Third Supplemental Proxies did not – ***and was not intended to*** – reach shareholders before they were required to vote on February 7th" (SAC ¶ 55.); and (3) "Defendants timed the proposal to freeze out Vornado ***in order to aggrandize their own interests*** and ***capture for themselves*** EOP's future potential without paying an adequate or fair price to the Company's shareholders" (SAC ¶ 69.) (all emphases added). In the Court's view, one cannot reasonably construe the Complaint as claiming that Defendants' proxy statements were false and misleading through mere negligence. And when a securities plaintiff only charges a fraudulent violation, heightened pleading standards are appropriate – even if the

relevant cause of action does not require proof of fraud. *See Kennedy*, 348 F.3d at 593.

As a final note, Defendants also contend that, in addition to the PSLRA, Rule 9(b) governs this action. But in light of the Court's application of the PSLRA (which provides a more stringent pleading standard than 9(b), *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 594 (7th Cir. 2006)), the Court need not rule on Defendants' Rule 9(b) argument.

### 2. *Adequacy of Plaintiff's Pleading*

Defendants contend that Plaintiff's allegations run afoul of the PSLRA with regard to both the loss causation issue and the general pleading standards issue. As to the first, Defendants argue that Plaintiff has failed to plead any loss whatsoever, let alone the "loss causation" required by the PSLRA. Second, Defendants argue that Plaintiff has failed to identify any misleading statements or omissions or the reasons any such statements or omissions were misleading, as required by the PSLRA.

### a. *Plaintiff's Loss Allegations*

As noted above, the parties dispute whether the PSLRA or the common law rule governs the causal link between the defendant's conduct and the plaintiff's loss. As also noted above, the Court has concluded that the PSLRA governs this action. But Plaintiff's loss pleadings are deficient under either standard because the Complaint appears to contain no loss allegations at all. *See* 15

U.S.C. § 78u-4(b)(4) (requiring proof of causation of "the loss for which the plaintiff seeks to recover damages"); *Mills*, 396 U.S. at 385 (analyzing the pre-PSLRA requirements for showing a "causal relationship between the violation and the injury for which he seeks redress").

Plaintiff's only response is to point to the Complaint's allegation that Blackstone sold $15 billion dollars' worth of EOPT properties on the same day the acquisition closed. He argues that this allegation demonstrates that "the value of continued ownership [of EOPT stock] exceed[ed] the value of the Acquisition consideration." But the Court does not see, and Plaintiff does not explain, how the allegation supports even this vague and speculative type of economic loss. At the very least, pleading loss would seem to require some allegation that Plaintiff's holdings in EOPT would have at some point been worth more than the $55.50 per share he received from the merger.

### b. *False Or Misleading Statements Or Omissions*

Although Plaintiff's loss allegation deficiency is independently fatal, the Court also notes the Complaint's failure to meet the PSLRA's heightened pleading standards. First, as to Plaintiff's allegations that Defendants omitted material information from the proxies, Plaintiff was required to allege not just that Defendants made such omissions, but that those omissions rendered statements that Defendants actually made misleading. *See*

17 C.F.R. § 240.14a-9(a).  Plaintiff was further required by the PSLRA to explain **how** any information allegedly omitted from the proxies had such an effect on a specific statement actually made. 15 U.S.C. § 78u-4(b)(1).  Instead, Plaintiff simply lists information that Defendants allegedly omitted from the proxies, which is insufficient under both of these standards.

As to Plaintiff's few allegations of affirmatively false or misleading statements (which appear only to involve statements of opinion regarding the fairness of the transaction), Plaintiff fails to explain with any specificity why the statements were false or misleading.  Moreover, such statements of opinion as a matter of law cannot be false or misleading unless the plaintiff alleges with particularity facts demonstrating that the opinion is not only objectively false but also subjectively false (*i.e.*, that the opinion holder did not actually believe the opinion), *In re AOL Time Warner, Inc. Securities and "ERISA" Litigation*, 381 F.Supp.2d 192, 243 (S.D.N.Y. 2004) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092-1096 (1991)), and Plaintiff here has alleged no such facts.

Additionally, the Complaint fails the PSLRA's state-of-mind pleading requirements.  As noted above, Plaintiff was required to state with particularity facts giving rise to a strong inference that Defendants acted at least negligently.  15 U.S.C. § 78u-4(b)(2).  The Court does not believe Plaintiff has done so here.

In particular, the Court takes note of the fact that the proxy statements in fact disclosed a great deal of information adverse to Defendants' alleged personal interest in completing the Blackstone transaction, including detailed accounts of Vornado's proposals, of the Board's ownership interests in various classes of EOPT shares affected by the merger, and of the numerous shareholder suits that were filed in an attempt to stop the merger.

Finally, the Court finds inadequate Plaintiff's allegations that the timing of the Supplemental Proxies necessarily rendered statements made in the Initial Proxy false and misleading. Under Plaintiff's theory, the information in the Initial Proxy became false and misleading when the subsequent Vornado-Blackstone bidding war changed the available offers for EOPT and resulted in the revised Merger Agreement. Plaintiff contends that Defendants effectively failed to correct the Initial Proxy's statements because Defendants issued the Supplemental Proxies too close to the vote date to have altered the information available to shareholders. In addition to Plaintiff's failure to allege with particularity facts creating a strong inference that the timing of the Supplemental Proxies was at least negligent, the Complaint acknowledges that Defendants did issue the Supplemental Proxies prior to the vote date and it makes only conclusory statements that shareholders did not have time to reasonably consider the supplemental information. It is particularly noteworthy that

Plaintiff makes no allegation that he cast his vote without having considered the Supplemental Proxies. The federal cases Plaintiff relies on regarding this issue are unpersuasive because they are between 15 and 28 years old and addressed a very different state of affairs than exists now in 2007 with regard to how information can be quickly and efficiently disseminated.

### 3. Section 20(a)

As noted above and conceded by Plaintiff, dismissal of Plaintiff's Section 14(a) claim also requires dismissal of his Section 20(a) claim.

### B. Breach of Fiduciary Duties Claim (Count VI)

Defendants urge the stay or dismissal of Count VI based on the *Colorado River* abstention doctrine. Under that doctrine, "a federal court may stay or dismiss a suit in exceptional circumstances when there is a concurrent state proceeding and the stay or dismissal would promote wise judicial administration." *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 818 (1976). Abstention is appropriate if the state and federal actions are parallel, *Jacobson v. City of Chicago*, 233 F.Supp.2d 1001, 1007 (N.D. Ill. 2002), and there are "exceptional circumstances" in which, on balance, the advantages of a dismissal or stay outweigh the disadvantages, *Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004).

The Court agrees with Defendants that Count VI should be dismissed under the *Colorado River* doctrine.  First, the Maryland action and Count VI here are parallel proceedings.  Two suits are parallel when "substantially the same parties are contemporaneously litigating substantially the same issue in both state and federal court."  *Jacobson*, 233 F.Supp.2d at 1007.  The Maryland action is against the same defendants as here and purports to represent the same class of persons.  It advances the same cause of action based on the same set of facts within many cases literally identical allegations.

Second, "exceptional circumstances" exist favoring dismissal of Count VI.  Generally, federal courts consider ten non-exclusive factors in determining whether such circumstances exist: (1) the desirability of avoiding piecemeal litigation; (2) the relative progress of state and federal proceedings; (3) the order in which jurisdiction was obtained by the concurrent forums; (4) the source of governing law; (5) the adequacy of state-court action to protect the federal plaintiff's rights; (6) the presence or absence of concurrent jurisdiction; (7) the vexatious or contrived nature of the federal claim; (8) the inconvenience of the federal forum; (9) whether the state has assumed jurisdiction over property; and (10) the availability of removal. *Caminiti and Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th Cir. 1992).  The Maryland action was filed first and has progressed all the way through

trial-court disposition and is currently on appeal. The claim is a state law claim, and as a member of the purported class in Maryland, Plaintiff's rights are protected in that action. The Court is also not unmindful of the fact that Plaintiff here did little to prosecute this action until after the Maryland court issued an initial unfavorable ruling. In short, this Court believes the balance of the above-listed factors weigh strongly in favor of abstention.

### III. CONCLUSION

For the reasons stated herein, the Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint is granted. The Complaint is hereby dismissed in its entirety.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** November 14, 2007

- 18 -